Thank you. May it please the Court, I'm Stanton Jones and I represent BP. The District Court abused its discretion by denying review of this $27.5 million award because the settlement program misapplied the settlement agreement by failing to reconcile and resolve massive discrepancies between the claimants' tax returns and the P&Ls, and also because appeal panels are split on this issue of whether the settlement agreement requires a book-to-tax reconciliation and resolution of large discrepancies. There is no question here that the discrepancies exist, that they total hundreds of millions of dollars, and that the settlement program did not perform a book-to-tax reconciliation or resolve the discrepancies. It's also undisputed that if this claimant's tax returns are accurate, or even close to accurate, the proper award here was zero. So at $27.5 million, this is one of the largest awards ever issued under this settlement agreement, but according to the claimant's own tax returns, it should have been zero. The book-to-tax discrepancies here could not be more stark, and just a couple of numbers tell the story. According to the P&Ls, the claimant-specific P&Ls that were used to calculate this award, the claimant's revenue decreased, it went down, by $93 million from the benchmark period 2007 to 2009 to the compensation period in 2009, and it did decrease according to the P&Ls. But according to the claimant's tax returns, in the same time period, the claimant's revenue actually increased by $65 million. That's a $158 million swing between what the P&Ls tell you and what the tax returns tell you. It is a radical difference. It's the difference between a company whose financial performance plummeted after the spill, if you heed the P&Ls, versus a company that was healthy and growing, whose financial performance was substantially improving in the same period after the spill. And again, it's the difference between a $27.5 million award and no award at all. And yet, despite the discrepancies, the settlement program did not perform a reconciliation or attempt to resolve them. On the misapplication of the settlement agreement, both the relevant legal principles and the facts are straightforward. On the law, Exhibit 4A to the settlement requires every claimant to submit complete federal tax returns in order to ensure that the revenue and expense figures on the claimant's P&Ls are accurate. And this is critically important to calculating accurate awards that compensate for real economic losses. Tax returns are an ideal way of verifying the accuracy of the P&Ls because the tax returns are submitted to the federal government under penalty of perjury. The Claims Administrator's Policy 274 states that the Claims Administrator will reconcile the tax returns and P&Ls, and that if there is a material discrepancy, that the Claims Administrator will seek to resolve it. And in order to resolve it, Exhibit 4A authorizes the Claims Administrator to request additional documentation or information from the claimant. And here, in this case, again, it is undisputed that for every single year at issue from 2007 through 2011, there are just enormous discrepancies totaling hundreds of millions of dollars per year between the both the divisional P&Ls, the contemporaneous P&Ls that the claimant originally submitted, which combined the financials for both the claiming facility as well as a non-claiming facility out of the economic loss zones. It's also true for the... Let me just ask you a systemic question. It may be too simple, but, God, I don't know how many of these BP appeals I've heard, and I know we all have, and so on and so forth. The way you frame it, I mean, the enormity of this $27 million, a lot of the other cases we have, I mean, there are differentiations, but they don't seem to be as gargantuan as the way that you're expressing it. So I guess my sort of systemic question is, the gap is huge as you're articulating it and so on and so forth. The system seems to work pretty well throughout all these BP claims, et cetera, et cetera. How does such a gargantuan $27 million to zero discrepancy... Maybe at the beginning of this process, we said, well, everything's not in place. They're not used to it. It just strikes me that the way you argue, get through the process, and yet you said it's unmistakable error by the claims administrators at that level, much less Judge Barbier's level. Do you kind of get my question? Yes. So there have been a lot of claims. There have been claims where mistakes were made, where substantial mistakes were made. This Court has reversed entire awards, maybe not to the degree of $27.5 million, but this Court has reversed entire awards that should not have been issued at all, which is the... Well, we have, and I probably didn't precisely frame my question. I guess just from the standpoint of this not accounting sort of methodological way that it's framed, I guess I'll put it that way, not reconciling the P&Ls with tax returns. My question should be framed more at not some of the... We have reversed a lot of them for different other reasons, but this seems to pose this sort of methodological approach of not pairing the tax returns with P&Ls and so forth, which at the back end of this whole process seems a bit odd. You understand what I'm saying? So there is an appeal panel split on this issue. This issue has come up repeatedly during the administration of the settlement agreement, and appeal panels have taken different approaches to it. In the cases that we cited, the appeal panel decisions that we cited, appeal panels have held that the settlement agreement and policy 274 require, mandate a book-to-tax reconciliation, and also mandate that when there are material discrepancies identified that they be resolved in some manner. Other appeal panel decisions cited most prominently by the claimant itself in its appeal panel brief at Record on Appeal page 781, they hold the opposite. They hold that the settlement agreement doesn't require a book-to-tax reconciliation and gives discretion, is the word that both the claimant and these other appeal panels have used, gives discretion for whether the settlement program will look at the tax returns with the P&Ls to see if they match, and if there are discrepancies, whether they will be resolved. So this issue has come up a lot. It has prompted disagreement among the appeal panel. The appeal panel excused the settlement program's failure to perform a book-to-tax reconciliation or to resolve the material discrepancies. As I said, the issue is of enormous significance here because of the amount of money that's at stake, and because the discrepancies are so large, performing a reconciliation and resolving them could zero out a $27.5 million award. On the relevant legal principles, Exhibit 4A, as I said, requires every claimant to submit federal tax returns, and Policy 274 requires the reconciliation and resolution of discrepancies, and because the discrepancies here are so large, they're a $27.5 million award. So I can just give you a few more numbers that are really striking. According to the P&Ls, the average revenues for this claimant from 2007 to 2009 were $386 million, and then in 2010 were $293 million. That's the $93 million decrease. But according to the tax returns, the claimant's average revenues for the year were up to $595 million in 2010, an increase of $65 million. The tax returns and the P&Ls are painting portraits of two totally different companies. One is healthy and growing, and the other is gravely ill. It's the difference between a company that sees a revenue decrease year over year of 24 percent going down versus a company that sees a revenue increase of 12 percent year over year. And again, that's the same for whether you're looking at the divisional P&Ls or the claimant-specific P&Ls that were created for purposes of this claim. And the settlement program didn't even attempt to resolve the discrepancy. The claimant itself repeatedly admitted before both the appeal panel and the district court that the settlement program failed to reconcile the P&Ls and the tax returns, much less to resolve the massive discrepancies that exist. And we compiled those admissions on page 14 of our reply brief. They're in the record on appeal in the claimant's briefs at pages 865, 868, and 294 to 95. This is especially problematic in this case because it's undisputed that the P&Ls, the claimant-specific P&Ls that were used to calculate this claim, we know that they had other major errors that needed to be corrected at the appeal panel phase. The settlement program in creating these P&Ls years after the fact erroneously included related party transactions that should have been excluded. The settlement program also erroneously failed to convert the claimant's revenues from the 445 accounting method to a 12-month calendar basis. There are substantial indicia that the claimant-specific P&Ls created for purposes of this claim are wrong, and when you compare the P&Ls to the tax returns and they disagree by hundreds of millions of dollars, it is not sufficient simply to say we're exercising discretion not to inquire. Claimant says that the settlement So first of all, that's not a decision, informed or otherwise, that the settlement agreement authorizes the program to take. The settlement agreement requires a book to tax reconciliation. But in any event, this informed decision argument is belied by the record. First, the settlement program's calculation notes, which are intended to provide a comprehensive look at the claim, don't even mention the book-to-tax issue at all. Don't identify the discrepancies, much less provide any rationale for why they were ignored. And second, the claimant's own arguments show that the settlement program was not informed. In its appeal panel briefing, the claimant argued that the program ignored the discrepancy because the tax returns don't actually reflect its sales based on some complicated transfer pricing model. But claimant concedes that, quote, the record does not contain detailed information about that transfer pricing model. So the settlement program and the appeal panel couldn't possibly make an informed decision about an issue that the claimant acknowledges they don't understand or have details about. The claimant says you didn't raise this before the appeal panel. He raised it for the first time in the district court. Can you respond to that? So that's not accurate. BP absolutely preserved this issue. We squarely argued the point in our appeal panel briefing. We said that the discrepancies are a fundamental issue requiring remand. We embedded a chart that showed the every year. In our supplemental appeal panel briefing, we had a whole section titled claimant's tax returns belie claimant's position. That's at record 303, 307. I'd also point you to 832 to 834. And we know that this issue was addressed by BP because claimant also addressed the issue in its appeal panel briefing under an entire section titled there is no need for any remand because the settlement program properly exercised its discretion not to require a book to tax reconciliation. That was claimant's argument at the appeal panel phase. I'll reserve the rest of my time. All right. Thank you, sir. We'll hear from Mr. Eber. May it please the court. Mike Eber for the claimant. This court has repeatedly held that Judge Barbier need not grant discretionary review of a request that involves no pressing question of how the settlement agreement itself should be interpreted or implemented but instead simply raises the correctness of a discretionary decision in the facts of a single case. Now, everything my friend Mr. Jones just said relates to the facts of this case, whether the documentation was sufficient, what precise steps were taken by the settlement program accountants and other factual findings made by the appeal panel. So this is the quintessential decision where BP is ultimately challenging the record and the facts of a case rather than as you alluded to, Judge Eber. Now, BP tries to cloak its appeal in the language of the settlement and policy 274 but those arguments ultimately run head first into the specific fact findings that the appeal panel made. The appeal panel considered BP's challenge to the reliability of the P&Ls and it expressly found that the claims administrator accountants were diligent, detailed and precise. I thought they didn't maintain this argument for them. Well, Your Honor, there's an important distinction which is that BP did mention discrepancies to the appeal panel but it did so in the context of a factual challenge to the reliability of the claim award. The appeal panel addressed that head on and found in favor of the claimant and evidently credited our response that in part these purported discrepancies are due to a tax accounting methodology rather than a true discrepancy that undermines the reliability of the P&Ls. What BP failed to do was to raise its current interpretive argument about whether book tax discrepancies must be resolved in the way that BP contends is required by policy 274. In fact, BP never even mentioned policy 274 to the appeal panel. Now, in making these findings about the reliability of the P&Ls, the appeal panel also expressly found that the accountants had not only exercised their discretion in an acceptable manner but that they did so in a way that was sound and proper. Now, those findings ultimately doom BP's appeal for several reasons, the first of which I want to emphasize is that the settlement agreement prohibits the relief that BP... The overarching command of the settlement was to deal with economic reality. You have a sophisticated transfer pricing model, which creates a very different picture to the government for a taxpayer's purpose and for the purpose of recovering on claims. Just fundamentally at the outset of that, it's very difficult to say that no one even talked about that. The accountants' explanations for it simply are the explanations of how you got to the numbers. But the ultimate question is, how do you report to the United States government a profit level at one point and then claim the lost profits in essence in this panel in such a differential way? Let me address that head on because... I think that's where it comes down to. Sure. Now, the thrust of BP's argument is that there's this problem of tax returns that reveals a great discrepancy and a red flag. Those comparisons are misleading for several important reasons. The first of which, as BP knows very well, when a multi-facility business like the claimant here files a claim for one of its facilities as opposed to all of its facilities... We file separate tax returns for the facilities? No, the claimant here is part of... Its parent company files consolidated tax returns, and the only entry in the tax returns relevant to the claimant is a consolidated gross revenue for the claimant. It doesn't differentiate between the claimant's facility in Fulton, Mississippi, which is the only entity, the only facility, rather, that's relevant to the claim here. The tax returns don't say anything about that facility. They're just an overall picture of the company. Was there any attempt to try to distinguish on the tax return, the amounts on the tax return, as you did on the P&Ls? As I understand, the P&L, you engaged in an exercise of carving out for this particular facility. I mean, I realize on the tax return is what it is, but was there any attempt in addition to what you did on the P&L to try to explain the tax differential? So, yes. When the issue was teed up before the appeal panel, the claimant submitted two affidavits from its parent company's CFO, who's the chief financial officer of a public company, and he explained why you should not expect a correspondence between the tax returns and the P&Ls precisely because the tax returns are measuring the consolidated economic performance of the parent company, and the way it works is the parent company's Mueller Industries, they have a dozen entities within their standard products division. In the ordinary course, every sale from those 12 entities gets bundled together into one entity for internal reporting purposes, but then when the tax returns are being prepared, they need to redistribute that back to the entities, and they use a very sophisticated transfer pricing model. So, as Martin explained, and this is tabs one and two of our record excerpts, you can't work backwards from the tax returns to get to the P&Ls because of the intervening transfer pricing methodology, and more fundamentally, Judge Englehart, you cannot take the tax returns on their face and look more granularly to split up the claiming entity in order to look at the claiming facility as opposed to the other facility. The only way to do that is to look at transaction level evidence, and that's precisely what the settlement program did here. I heard very little from BP just now and nothing in their reply brief about the transaction level sales records that the program considered. This wasn't a claim that snuck through the process despite a glaring error. The settlement program utilized a team of accountants from Pricewaterhouse Coopers that basically reconstructed P&Ls based off of the divisional P&Ls we submitted in combination with half a million transaction level records. Now, those records are so detailed, they identify every single sale by the claiming facility of a product shipped to a third party. So, the claims administrator, rather than looking at the entity level picture from the tax returns, was able to and did look at the facility level picture from the source documentation, and that's particularly important because that's the process the settlement contemplates. In Exhibit 4A, which is the only reference to the word discrepancy in the settlement agreement itself, the exhibit says if there is a discrepancy, the claims administrator may request additional information and source documentation. In this case, the claims administrator had the source documentation. It had been submitted about a year before the tax issue ever came up. So, it may be true that in the ordinary course, if the issue were teed up and the program realized there was this great difference between the P&Ls and tax returns, that perhaps there's some obligation to call for supplemental documentation. But on the facts of this case, the program accountants had that documentation. They had the 500,000 records at the transaction level, and they made an informed decision that there was absolutely no need for further documentation. What BP seems to be suggesting is that the program had an obligation to audit the tax accounting methodology and bring in the tax accountants and make sure that the transfer pricing model was valid. Now, that just doesn't find any support in the text of the settlement, and at bottom, BP can challenge that. They can say that the program administrators made the wrong decision on the facts, but that's a fact-bound challenge to what the program did here. It's simply not an issue of systematic importance to the overall administration of the settlement. Now, going back to the comparison that BP is making, not only is it misleading because of this entity versus facility issue, it's also misleading because the tax returns only reflect year-over-year revenue, whereas the P&Ls reflect monthly revenue. And as the panel knows, the causation tests are based on a benchmark period and a compensation period with particular months. It's not year-over-year. It's not 2010 versus 2009, in part because the spill happened in the middle of 2010. Again, the only way to look at the month-to-month comparison, the true apples-to-apples, is to look at the monthly P&L information that we submitted. And there's no real from BP that that is based off of contemporaneous documentation that was provided by the claimant, and also that Mr. Martin testified that the books and records that were supplied to the settlement program are the very same books and records that ultimately were recalibrated in order to form the tax returns. I mean, he testifies that it's the same books and records and explains the purported difference. That's evidence that the appeals panel was allowed to credit. And on that point, I'll also emphasize that it may be true that the record is thin about exactly what the program accountants thought about a transfer pricing model. There was a conference call that took place. This is documented in tab three of our record exhibits and ROA 810. The settlement program was aware of these differences. They're obvious. I mean, we agree with that. If you look at the two numbers, there are great differences. Settlement program knew that, contacted us, held a conference call with the PwC accounting team, including their supervisor for multifacility claims on the one hand, and with the professional accounting consultants from the claimant on the other. It received an explanation. It evidently found that explanation satisfactory. Now, the details of it aren't in the record. I'll acknowledge that. But still, it's BP's burden to show clear which I don't think they can do based on an ambiguous record where all the inferences go in our favor. But even setting that aside, the appeal panel had a robust record before it. My friend, Mr. Jones, said that we made an admission below that the record doesn't contain detailed information about the transfer pricing model. That was in reference to the record before the claims administrator. There's a difference between that and the expanded record that was for the appeal panel. We submitted three affidavits to the appeal panel, and I'll note that Rule 13H of the rules governing the appeal process expressly authorizes a claimant in the position of MCTC to submit additional supporting documentation and affidavits during the appeal panel process. That evidence is undisputed. I mean, there's no realistic challenge from BP that says the affidavit's wrong or that it shouldn't be credited for some reason. We're talking about someone with expertise about the issue who answered every single specific point that BP raised in their briefing. At the very least, BP can't show clear error because the appeal panel was allowed to credit that evidence, and that establishes that there's no genuine discrepancy, even if on first appearance it looks like there's a big difference. A discrepancy only exists when there's a difference because you expect a different result, and the difference calls into question the reliability of what you're looking at. Now, that may have been true at first glance, but once the accounting team receives an explanation from Mueller, Copper's accounting consultants, and then the appeal panel receives affidavit evidence about exactly what's going on, that clears up the discrepancy. In other words, it resolves it to their satisfaction, which by BP's own admission is something that the program has substantial discretion to do. Exhibit 4A does not include any mandatory terms about exactly how a reconciliation must proceed, and even 274, the policy that they rely on heavily, it's not a part of the settlement agreement itself, but even that policy expressly says that reconciliation may be performed in the professional judgment of the claims administrator, and that the question of how to resolve discrepancies is not a mandatory resolution of them. The language of policy 274 is merely that the accountants must seek to resolve it. That language is important. It reflects that the drafter of 274 recognized that eliminating the discrepancies might not be possible. The question under 274 is whether there are efforts taken to resolve it and whether those evidence, but that was the program's decision to make. Finally, the tax returns are particularly important as well because another difference between the P&Ls and the tax return numbers are that the P&Ls include not only the external sales that are relevant, in fact, the only relevant information for a claim, but the P&Ls and the tax returns also include internal sales, which have to be excluded. The claims administrator was able to exclude the internal sales from the P&Ls, but that can't be done for the tax returns. So the tax return numbers are going up and down in ways that BP claims are suspicious, but in part that reflects the operations of another facility. It reflects the variation in internal sales from year to year, as well as the transfer pricing model's differential accounting of how those internal sales should be credited to one entity or another. BP mentions that the overall reliability is in doubt because of the other errors that were acknowledged at the appeal panel stage. I'd like to briefly address that. First, BP is ignoring the clear error standard that we set forth at length in our brief, so raising a question about reliability is not enough to reverse Judge to accept the appeal panel's finding that the P&Ls were indeed reliable. And the two errors that BP is referring to, they don't go into what those were in any depth, and that's because even BP described those as quote-unquote unintentional and quote-unquote technical. That's BP's words at ROA 311 and ROA 315. Those two errors were also isolated. They reduced the claimant's award by about 10 percent, and they do not call into question the overall reliability of the P&Ls that the program used. In fact, BP's own expert relied on the source documentation we provided when he calculated a corrective for those two unintentional and technical errors. So if anything, the ability of their expert to recalculate the numbers and fix the errors shows why the underlying information was in fact reliable. Now, BP claims that we've acknowledged that there was no actual reconciliation performed. I think that's simply not accurate. There are some stray statements in the record that refer to the word reconciliation, but the precise meaning of that term was never at issue until this appeal. And this goes back to the waiver point, Judge Higginbotham, which is that BP never said that the program had failed to perform a reconciliation and that it had a legal duty to do so. So the exact meaning of what reconciliation means, particularly in the context of 274, which is rather unique in its structure, was never presented until this case. The statements in the record are also qualified where we've consistently argued that the settlement program sought to, that it acknowledged the discrepancies, that it gathered more information, that it made an informed decision to resolve them. And at worst, if there's imprecision in the record, that still doesn't deal with the legal question, which is what does reconciliation mean. And I heard Mr. Jones basically acknowledge that our interpretation of that is right. He said in his opening that policy 274 refers to, quote, reconcile and resolve. That's two distinct steps, which is what we argue in our brief. Step one, reconciliation, is simply the comparison of the two documents in order to identify a difference that may require further inquiry. It's undisputed that that evidence shows, particularly the tab three of our record exhibits, shows that the settlement program was aware of the differences, held a conference call, and the precise topic they were talking about is why are these differences there. That's a reconciliation in our interpretation of the word and within the structure of policy 274. The second step about resolve is really what BP's case boils down to. They're saying that the claims administrator made certain efforts to resolve the discrepancies, but BP's not satisfied that they were thorough enough. Now, that's not a systematic question of importance that Judge Barbier needs to review, and there's, you know, an avalanche of Fifth Circuit authority for that principle, particularly when the appeal panel made express findings that the steps taken here to resolve the discrepancy were reasonable under all the circumstances. And, you know, I don't have much time, but in particular, the transaction level sales records show very granular information that confirms that the calculation was exactly right. That's a spreadsheet that was so large we had to put it on a different website. It couldn't even be accepted by the claims portal. And in full disclosure, the whole spreadsheet isn't even in the Fifth Circuit record. There's an excerpt of it, and there's a summary of all the fields. If we added it to the record, it would double the size of the record. It's 5,000 pages. All of that is very granular information that supports exactly what the claims program did, plus the affidavits from Mr. Martin that explain this tax differential and why it should be expected. I'd like to turn briefly to the appeal panel split issue. I think the Court can resolve that rather easily based on the Florida restaurants case that Judge Higginbotham and Judge Stewart were on the panel for. That's a decision from April of this year. It addressed the book tax issue. This Court considered the same five decisions that BP cited in their brief here and said there's no genuine appeal panel split because all of those results ultimately turned on the facts of the case as opposed to an issue of legal interpretation. Now, BP retreats in their reply brief and tries to cite a few additional decisions that hadn't been cited previously to anyone, but those fall into the same pattern. They involve different claimants. None of them seem to involve a multifacility business. None of them involve a company that has a complex transfer pricing methodology, and the documentation is fundamentally different. Each of the three cases cited in their reply brief involved a specific finding of error where the source documentation hadn't been provided, there hadn't been an explanation for discrepancies, or even a confession of error was made by the claimant or the claims administrator. This case involves the exact opposite circumstance. The appeal panel may express findings of fact. None of those are clearly erroneous, and there's overwhelming evidence in the record that the claims administrator did precisely what it was supposed to do, and to the extent BP challenges that, it's a question of fact that Judge Barbier would not need to review in any event. Thank you. Thank you, sir. Back to you, Mr. Jones, for rebuttal. The claimants' counsel acknowledged that there are massive discrepancies, doesn't dispute that the discrepancies between the tax returns and the P&Ls that were used to calculate this award total hundreds of millions of dollars a year, doesn't deny that the tax returns and those P&Ls paint pictures of two completely different companies unfamiliar to each other, and claimants' counsel further acknowledged that the record is thin. Those were his words, the record is thin on what the settlement program knew or did about this issue, but it's worse than thin. There was apparently a single phone call where the settlement program apparently decided not to pursue the issue any further. That contradicts the settlement agreement, which requires a book to tax reconciliation and resolution of material discrepancies, but it's even worse than that, because that phone call only related to the divisional P&Ls, the contemporaneous P&Ls that were originally submitted by the claimant. Those P&Ls were not used to calculate this award. At some point after that phone call, new P&Ls were created and were used to calculate the award, and there's no indication whatsoever in the record that the settlement program ever even acknowledged the massive discrepancies between those claimant-specific P&Ls and the tax returns. The claimant points to this transfer pricing model, which they say is very complicated, but it's not just that the tax returns don't match the P&Ls perfectly, dollar for dollar. This is a situation where the tax returns are so radically different, are so polar opposite from the P&Ls, that it just raises a huge red flag that the settlement agreement required to be explored and understood and explained, and that just wasn't done. The claimant says that this is just a factual dispute. It's not. The relevant facts here are not in dispute. There are huge discrepancies, is an undisputed fact, that the claims administrator chose, when it was looking at the divisional P&Ls, chose not to pursue a book to tax reconciliation, is an undisputed fact, that the record contains no indication that the settlement program ever even acknowledged the discrepancies between the claimant-specific P&Ls created later and the tax return. That's an undisputed fact. And you can review the settlement program's calculation notes. They're at Record on Appeal, pages 6701 to 6709. They describe the work that was done by the settlement program, and they do not mention, not once, that there were discrepancies, much less explain why those discrepancies were ignored. The claimant said a couple of times that the appeal panel apparently or presumably credited their explanation of why the tax returns are so radically different from the P&Ls, but there's no indication of that in the appeal panel's decision. And if you look at the claimant's briefing to the appeal panel, it argued that the settlement discretion not to follow up on huge discrepancies between the tax returns and the P&Ls and the appeal panel's decision just doesn't, it doesn't say that they credited the claimant's explanation for the discrepancies. The Florida restaurant case doesn't resolve the appeal panel split issue. First of all, both parties' briefs in this case cite additional different appeal panel decisions that crystallized the split, and the split is over whether the settlement program is required to conduct the reconciliation and also to resolve the discrepancies or whether the settlement program has discretion simply to ignore those issues as occurred here. But in any event, the Florida restaurant case didn't say that there was no split, only that the Florida restaurant case itself lacked the factual predicate of some error by the appeal panel. All right. Thank you.